UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


HAGAN DEVELOPMENT COMPANY, et al.                    PLAINTIFFS


v.                                          CIVIL ACTION NO. 3:10CV-372-S


WFM-WO, INC.                                              DEFENDANT


**MEMORANDUM OPINION AND ORDER**


This matter is before the court on cross-motions of the parties for judgment on count I of the

complaint in this contract action (Dns 15, 22).  The two-count complaint filed by the plaintiffs

Hagan Development Company and Shelbyville Road Plaza LLC (collectively herein "Hagan" or

"Landlord") seeks a declaratory judgment concerning the rights of the parties to a lease for space

in the Shelbyville Road Plaza shopping center (the "shopping center") in Louisville, Kentucky.

A party moving for summary judgment has the burden of showing that there are no genuine

issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*,

536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent

summary judgment.  The disputed facts must be material.  They must be facts which, under the

substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty*

*Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be

such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962) The parties agree on the essential facts related to Count I.[1]

In August, 2000, the defendant, Wild Oats Martkets, Inc. (now WFO-WO, Inc., referred to herein as "Wild Oats" or "Tenant"), entered into a lease agreement (the "lease")with Hagan to lease approximately 28,048 square feet in the Shelbyville Road Plaza shopping center. The shopping center was to be constructed in two phases, with Wild Oats and certain other tenants to open their businesses in Phase I. The lease required Hagan to render the premises suitable for Wild Oats grocery store operations. The cost to Hagan to meet Wild Oats' specifications was approximately $1,550,000.00.

The lease between Hagan and Wild Oats has a 20-year term extending to April 30, 2022. Under Article 4, Wild Oats is required to pay fixed monthly rent ("Base Rent") and an additional rent in the amount of 1.5 percent of Wild Oats' annual gross sales at the premises ("Percentage Rent") exceeding a designated "breakpoint." Wild Oats opened its store on October 15, 2002 and began paying rent under the lease thereafter.

---

[1]There may be some dispute as to facts underlying Count II. That count is not before the court on these motions.

In early 2007, Wild Oats merged with Whole Foods Market, Inc.[2] who operated a store less than a mile from the Wild Oats location.  On October 24, 2007, Wild Oats closed its store, but continued to pay rent to Hagan.

Thereafter, a number of other tenants in the shopping center also closed their stores.  In May, 2009, Wild Oats notified Hagan that it intended to pay reduced rent (termed "Alternate Rent") in accordance with Section 4.3(b), termed by the parties as the "co-tenancy provision," because the occupancy rate of Phase I of the shopping center had fallen below 75%.

Section 4.3(b)[3] of the lease entitled "Rental Abatement Based on Occupancy" states:

> If at any time following the earlier to occur of (I) completion of construction of Phase I of the Shopping Center (as designated on the Site Plan) or (ii) nine months following the opening by Tenant for business in the Premises, the tenant of Space M (as shown on Exhibit B) of the Shopping Center or tenants occupying 25% or more of Phase I cease operations at the Shopping Center and no tenants of equal stature occupy the vacated space within 180 days following the termination of the tenants' operations ("Co-Tenancy Failure"), Tenant may (A) pay to Landlord in lieu of Base Rent hereunder an amount equal to Base Rent reduced by an amount equal to the Base Rent multiplied by the greater of (1) the percentage vacancy rate for the Shopping Center (for example, if the vacancy rate was 31%, the Base Rent would be reduced by 31%) or (2) the percentage reduction in Tenant's aggregate gross sales over Tenant's projected gross sales for the same period ("Alternate Rent") payable in arrears on the 20th day of each month following the Co-Tenancy Failure, until such time as the Cotenancy [sic] Failure is cured or (B) if Landlord is unable to cure (defined as executing a lease with occupancy required without contingencies within 120 days thereafter) the Co-Tenancy Failure within 240 days after the Tenant commenced to pay Alternate Rent, Tenant, at Tenant's Option, may (1) terminate this Lease at any time thereafter but prior to a cure of the Cotenancy [sic] Failure on sixty (60) days prior written notice to Landlord or (b) resume, 365 days after Alternate Rent payments commenced, full payment of Base Rent as provided in this Lease (at which time Tenant's right to terminate shall expires as to the then-current Cotenancy [sic] Failure).

---

[2]Forming the defendant entity, WFM-WO, Inc.

[3]Subsection (a) addresses the timing of the opening dates for various tenants so that Wild Oats, Linens 'N Things, Circuit City, and Hawley Cook Bookstore would be projected to open near in time to one another.  This portion of the Rent Abatement provision is not pertinent to this opinion.

Hagan informed Wild Oats that because it had already closed its store, it was not entitled to pay reduced rent or terminate the lease under Section 4.3(b). It also notified Wild Oats that the occupancy rate would increase to 75% within the 180-day window within which it may cure a Co-Tenancy Failure and prevent Wild Oats from paying Alternate Rent. Wild Oats continued to pay its full Base Rent and did not terminate the lease.

In November, 2009, the occupancy rate again fell below 75%.[4] On April 21, 2010, Wild Oats again notified Hagan that it would invoke Section 4.3(b), begin paying Alternate Rent on May 1, 2010, and terminate the lease on December 27, 2010 absent cure.

On May 4, 2009, Hagan filed this action seeking a declaratory judgment that (1) because Wild Oats is no longer operating its store on the premises, it is precluded from invoking Section 4.3(b) of the lease, and (2) Halloween USA, a seasonal tenant which will occupy the space vacated by Circuit City, will cure the Co-Tenancy Failure under the lease. Through this lawsuit, Hagan seeks to prevent Wild Oats from terminating the lease before the end of its term and recoup the amount by which Wild Oats has reduced its monthly rent payments[5] to date.[6] The cross-motions before the court are addressed to Count I of the complaint in which Hagan seeks a declaration that

---

[4]There is no dispute that the occupancy rate fell below 75% of the Phase I property without regard to the vacant square footage leased by Wild Oats.

[5]Hagan states that in the event the court finds that Wild Oats is entitled to pay reduced rent, it disputes Wild Oats' calculation of the amount of the reduction. Hagan urges that square footage which has been constructed but never occupied cannot be included in the calculation of the percentage vacancy rate, as tenants could not have "ceased operations" in that space. Wild Oats counters that Hagan has not asserted such a claim in its complaint. This opinion will address only the question of the availability of Section 4.3(b) to Wild Oats as a non-operating tenant. Any concerns over the amount of the reduction in rent will be addressed after the matters of availability and cure have been decided.

[6]The court has not been advised whether Wild Oats terminated the lease and ceased paying rent on December 27, 2010. The court assumes that it has continued to pay Alternate Rent pending a decision by the court.

Wild Oats is precluded from invoking Section 4.3(b) of the lease. The question of cure raised in

Count II remains pending.

The construction, meaning, and legal effect of a contract are questions of law for the court.

*Pedicini v. Life Insurance Co. of Alabama*, 686 F.Supp.2d 692, 695 (W.D.Ky. 2010), *citing Kemper*

*National Insurance Companies v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky.2002);

*Equitania Insurance Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky.2006). As stated in

*Pedicini, supra.*,

> The issue raised in the parties' motions for summary judgment is governed by the principles of contract interpretation. The interpretation of an insurance contract is a question of law for the Court to decide...'In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself.' *Logan Fabricom, Inc. v. AOP Partnership LLP*, 2006 WL 3759412, *2 (Ky.Ct.App. December 22, 2006). '[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.' *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky.2003) (quotation and citation omitted). See also *York v. Kentucky Farm Bureau Mutual Ins. Co.*, 156 S.W.3d 291, 293 (Ky.2005) ("The clear and unambiguous words of an insurance contract should be given their plain and ordinary meaning.").

686 F.Supp.2d at 695. The parties agree that the contract between Hagan and Wild Oats is

unambiguous and must be enforced according to its express terms. *First Commonwealth Bank of*

*Prestonsburg v. West*, 55 S.W.3d 829, 835-36 (Ky.App. 2000).

The court finds that Wild Oats' cessation of business in the leased space does not preclude

it from invoking its rights under Section 4.3(b) of the lease. The plain language of 4.3(b) does not

require Wild Oats to be an operating business in order to seek the benefit of the clause. As long as

Wild Oats has the obligation to pay Base Rent, it may have a reduction (termed an "abatement"

under 4.3(b)) of that amount in the event of a Co-Tenancy Failure.

Hagan contends that the requirement that Wild Oats be an operating business is implicit in the language of Section 4.3(b). It urges that Wild Oats must have gross sales in order to calculate the appropriate Alternate Rent in the event of a Co-Tenancy Failure. Finding this implicit requirement, it urges, would effectuate the intention of the parties in including this provision to protect Wild Oats as an operating tenant from the effects of diminished sales due to vacancies of other tenants. Response (DN 21), p. 14. However, the court is to effectuate the intention of the parties as those parties have memorialized that intention in their clear an unambiguous contract terms. *Pedicini, supra*. Section 4.3(b) is not limited expressly or by implication to operating tenants.

Section 4.3(b) permits a reduction in Base Rent by the greater of two percentages - the percentage vacancy rate of the shopping center or the percentage reduction in aggregate gross sales over projected gross sales by the Tenant. If gross sales of the Tenant are zero, the greater percentage could only be the percentage vacancy rate. Thus the net result under Section 4.3(b) is that its cessation of business precludes Wild Oats from reducing its Base Rent by any more than the percentage vacancy rate. However, there is nothing in the lease to preclude Wild Oats from invoking its rights under the section altogether.

A business which did not experience a decline in sales despite an increased vacancy rate in the shopping center similarly would exhibit no reduction in gross sales with which to offset Base Rent. Yet such an operating tenant would, according to Hagan, be entitled to reduce its Base Rent under Section 4.3(b), but an non-operating tenant is not. However, there is no express prerequisite to the invocation of 4.3(b) that a tenant be operating and it is not implicitly required by the Alternate Rent calculation.. Whether a tenant exhibits a reduction in gross sales or not, where there is a Co-

Tenancy Failure under the lease, the Tenant is entitled to an abatement.  Operating status is simply immaterial.

For the reasons set forth herein and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that

1.  The motion of the defendant, WFM-WO, Inc., for judgment as to Count I of the Complaint (DN 15) is **GRANTED**,  and

2.  The motion of the plaintiffs, Hagan Development Company and Shelbyville Road Plaza, LLC, for judgment as to Count I of the Complaint (DN 22) is **DENIED.**


**IT IS SO ORDERED.**